IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARK APPLEGATE, | * | UNDER SEAL[1] |
| Plaintiff, | | |
| v. | * | Civil Action No. 8:21-cv-02059-PX |
| NAVARRO RESEARCH & ENGINEERING, INC., | | |
| Defendant. | * | |

\*\*\*

**MEMORANDUM OPINION**

Pending in this breach of contract dispute is the motion for summary judgment filed by Defendant Navarro Research & Engineering, Inc. ("Navarro"). ECF No. 35. The issues are fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the following reasons, the Court GRANTS the motion.

**I.     Background[2]**

Defendant Navarro provides environmental remediation and waste management services to government agencies, including the Department of Energy ("DOE"). ECF No. 37-1 at 9–10. In 2019, Navarro applied for a DOE contract to manage the Hanford 222-S Laboratory in Washington state. *Id.* at 11; ECF No. 37-5 at 4. Navarro and another entity, ATL, created a joint

---

[1] Because the parties filed certain exhibits under seal, the Court has provisionally sealed this Memorandum Opinion to give the parties an opportunity to request what, if any, portions of the Opinion should remain under seal permanently. Accordingly, within seven days from the date of this Opinion and the accompanying Order, the parties shall propose redactions to this Opinion. Failure to provide any such proposed redactions will result in the unsealing of the entire Memorandum Opinion without further warning.

[2] Except where otherwise noted, the facts related below are undisputed and construed most favorably to Plaintiff as the non-movant. *See The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 364 n.3 (D. Md. 2011).

venture called HLMI for the purpose of managing the 222-S contract.  ECF No. 37-1 at 11.  Navarro owned ▇ of HLMI.  ECF No. 42-1 at 5.

As part of the contract proposal, DOE required the corporate applicant to identify key personnel who would perform on the contract, specifically the Laboratory Manager, Facility Operations Manager, and Analytical Operations Manager.  ECF No. 37-1 at 14–15; ECF No. 38-2 at 1.  DOE also permitted, but did not require, the applicant to name those individuals who would occupy the positions of the Environmental, Safety, and Health ("ES&H") Manager and Engineering/Nuclear Safety Manager.  ECF Nos. 37-1 at 15–16; 38-2 at 1.

For each identified key personnel, DOE required a signed Letter of Commitment from the individual who would fill the key position.  ECF No. 37-1 at 30.  The Letter of Commitment confirmed that the individual would remain in the identified position for at least three years.  ECF No. 37-2 at 33.  If the applicant was awarded the contract, and the identified key personnel left within two years, the DOE contract exacted from the applicant a monetary penalty of $100,000.  ECF No. 44-3 at 10.  This penalty, however, was not set in stone, as the corporation awarded the contract could seek waiver of the penalty.  *Id.*[3]

In early April 2019, in preparation to apply for the 222-S contract, Navarro's President and CEO, Susanna Navarro-Valenti, found Plaintiff Mark Applegate's resume on LinkedIn and believed him suited for the ES&H position.  ECF No. 37-1 at 13.  Over the next 48 hours, Navarro-Valenti reached out to Applegate, interviewed him by phone, and offered him the position.  *Id.* at 19–21; ECF No. 41-3 at 3; ECF No. 37-2 at 27.  On April 5, 2019, Navarro emailed to Applegate the first offer which detailed his salary and signing bonus.  ECF No. 37-2 at 11–14, 27.

---

[3] After Navarro had been awarded the 222-S contract, it did seek such a waiver for Don Hardy, the individual originally named as the Laboratory Manager.  ECF Nos. 37-1 at 31; 42-1 at 23.

Three minutes later, Navarro's Vice President of Talent Acquisition, Jason Lesher, emailed Applegate a Letter of Commitment. *Id.* at 32–34. In the body of the email, Lesher wrote, "Hi Mark, here is a Letter of Commitment that is required for the proposal." *Id.* at 34. The Letter of Commitment, typed on HLMI letterhead, read in its entirety:

### LETTER OF COMMITMENT

> I hereby certify that the resume submitted as part of the proposal is true and correct, and Mark Applegate will accept the proposed position of ES&H Manager if HLMI, JV receives the award and will perform in the proposed position for a minimum of three years beginning on the date the <u>Notice to Proceed (NTP) is issued for the 100-day Transition Period</u> of the contract.
>
> I also hereby certify that I will be assigned full-time to the contract and will be physically located on the Hanford Site or within the local area.

*Id.* at 33.

After receiving these documents, Applegate asked Lesher to modify the offer to include housing and relocation reimbursements. *Id.* at 11, 35. Later that day, Lesher emailed a revised version of the offer (hereinafter "Offer Letter"). The Offer Letter, which Applegate signed, stated clearly that it was Navarro's "complete offer," and that Applegate's employment was "based on the 'at will' doctrine, meaning that either the employee or the employer may terminate the employment relationship at any time and for any reason." *Id.* at 36. The Offer Letter also detailed the salary, signing bonus, and other benefits to include moving expenses and a housing allowance; that Applegate's "start date" was conditioned "upon award for the 222-S contract to Navarro"; and that if Applegate "voluntarily terminate[d] [his] employment before completing two years of service," he would be required to refund Navarro the relocation funds. *Id.* at 36.

Applegate signed both the Letter of Commitment and the Offer Letter on April 5, 2019, in the spaces provided on the documents. ECF Nos. 37-2 at 33, 36; 51-4; 51-5. Pending the award of the 222-S contract, Applegate remained in his current position. ECF No. 37-2 at 19–

3

20.  But knowing that he would likely join Navarro, Applegate took on only shorter-term projects and reduced his hours.  ECF No. 41-2 at 7–8, 25.  Applegate also kept an eye on other suitable employment in case Navarro did not receive the 222-S contract.  ECF No. 37-2 at 20.

In April 2019, Navarro submitted its 222-S contract proposal to DOE.  ECF No. 41-2 at 5.  DOE's Source Evaluation Board ("SEB") reviewed the proposal.  ECF No. 37-5 at 4, 11–14.  The SEB assesses "the relative significant strengths, strengths, significant weaknesses, weaknesses, deficiencies, and cost and performance risks" of contract proposals that DOE receives.  ECF No. 37-5 at 11.  If SEB identifies a "deficiency" in a contract proposal, the contract is rejected.  *Id.*  A "deficiency" is defined as a "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level."  *Id.*  Part of SEB's evaluation included assessing the "suitability and qualifications" of the key personnel listed on the contract proposal.  *Id.* at 13–14.

On September 29, 2020, DOE notified HLMI that it had been awarded the 222-S contract.  ECF No. 37-1 at 26.  DOE also provided SEB's assessment of the key personnel that HLMI listed in its proposal.  *Id.* at 32–33; ECF No. 38-2 at 1.  The SEB personnel assessment particularly identified the individuals in the Laboratory Manager and Analytical Operations Manager positions as ████████████ and the Facility Operations Manager as ████████████████████████  ECF No. 38-2 at 1.

But SEB also identified the ES&H Manager, Applegate, as a contract ████████ ████████████████████████████████████████████████████████████ . *Id.* at 3.  ████████████████████ ████████████████████████████████████████████████████████████ *Id.*

4

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  *Id.* ████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████  *Id.*

  Ultimately, however, SEB gave the proposed team a rating of ██████ ECF No. 38-3. SEB concluded that HLMI had secured "a very capable and qualified team of Key Personnel that would likely exceed 222-S Laboratory contract performance expectations." *Id.*  Overall, SEB determined that "the operational experience and strong leadership" of the other identified key personnel ████████████████████████████████  *Id.*

  After DOE awarded the 222-S contract to Navarro, Navarro decided not to hire Applegate.  Instead, on October 21, 2020, Navarro-Valenti interviewed Garrett Knutson, and a few days later, hired him as the ES&H Manager on the contract.  ECF Nos. 37-1 at 38–40; 42-4. On November 6, 2020, Navarro informed DOE of its intention to replace Applegate with Knutson and requested that DOE waive the ████████████ ECF No. 38-4.

  During this time, Applegate had learned from searching the Internet that Navarro received the 222-S contract.  ECF No. 41-2 at 14.  Navarro-Valenti did not tell Applegate he would not be hired for the contract until late November.  ECF No. 41-2 at 19; 42-1 at 19.  Once they did speak, Navarro-Valenti told Applegate she decided to make the switch because of Applegate's "bad references" and SEB's assessment of him as a contract "weakness."  ECF No. 37-1 at 41.

  On June 14, 2021, Applegate sued Navarro for breach of contract and unjust enrichment in the Circuit Court for Prince George's County, asserting that Navarro's failure to place him on the 222-S contract as ES&H Manager supported the claims.  ECF No. 4.  Navarro thereafter

removed the action to this Court and answered the Complaint.  ECF Nos. 1 & 12.  Navarro now moves for summary judgment in its favor.  ECF No. 35.

II.     **Standard of Review**

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds that no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original).  Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another."  *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

III.    **Analysis**

A.  **Breach of Contract**

Navarro principally argues that because it had entered into an "at will" agreement with Applegate, as articulated in the Offer Letter, the breach of contract claim fails as a matter of law.  ECF No. 36 at 11.  This is so, says Navarro, because an at-will employment agreement permits either party to terminate the employment arrangement at any time and for any reason "without giving rise to a cause of action for breach of contract."  *Parks v. Alpharma, Inc.*, 421 Md. 59, 73

(2011). Applegate responds that because the Letter of Commitment is part of his employment contract and clearly states that he will be employed for a minimum of three years, then the agreement is not at will, and the claim survives challenge. ECF No. 41 at 17.

Applegate is correct that where an employment contract delineates a specific time period during which the employee promises to work, then "the employer is usually considered to have surrendered its ability to terminate the employee at its discretion"; and in that circumstance, the employer may fire the employee only for cause during the pre-established period of employment. *Towson Univ. v. Conte,* 384 Md. 68, 79 (2004); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 16 (2014). The dispute, therefore, centers on which documents constitute the entire employment agreement between the parties. Navarro contends that the Offer Letter is the entire, "integrated" agreement, while Applegate argues it is both the Offer Letter and Letter of Commitment.

An agreement is "completely integrated" when it serves as the "complete and exclusive statement of the terms of the agreement." *Reutemann v. Lewis Aquatech, Inc.,* No. DKC-04-63, 2005 WL 1593473, at *3 (D. Md. July 5, 2005) (quoting Restatement (Second) of Contracts §§ 209–210 (1981)). Whether a writing or writings constitute an integrated agreement is a preliminary question that the Court must resolve before reaching the merits of a contract claim. *See Shoreham Devs. Inc. v. Randolph Hills, Inc.*, 248 Md. 267, 271–272 (1967); *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640, 648 (D. Md. 2010), *aff'd*, 477 F. App'x 84 (4th Cir. 2012); Restatement (Second) of Contracts § 209(2) (1981).

When the employment agreement includes an express integration clause—that is, a statement reflecting that the parties meant the document to constitute the entire agreement—this clause offers "compelling evidence that the parties intended 'to finalize their complete

7

understanding in the written contract and hence that there was no other prior or contemporaneous agreement not included in the written contract.'" *Baker DC, LLC v. Baggette Constr.*, 378 F. Supp. 3d 399, 408 (D. Md. 2019) (quoting *Pumphrey v. Kehoe,* 261 Md. 496, 505 (1971)). However, the presence of an express integration clause does not end the matter. *See Shoreham Devs.*, 248 Md. at 272 ("[E]ven the sentence 'This contract contains the final and entire Agreement between the parties,' may embody a recital of facts which may be untrue."). The Court must also consider "the circumstances of the instruments' drafting and the content of the written instruments." *Jaguar Land Rover*, 738 F. Supp. 2d at 648. "The essential question is whether the parties intended their writing to be the final or complete expression of their agreement." *Reutemann*, 2005 WL 1593473, at *3 (quoting 1-5 Murray on Contracts § 81 (2001)).

Having considered the record, the Court concludes that the Offer Letter is the completely integrated, at-will employment agreement between the parties. The letter unambiguously states that it is "Navarro's complete offer," and that Applegate's employment would be "based on the 'at will' doctrine, meaning that either the employee or the employer may terminate the employment relationship at any time and for any reason." ECF No. 37-2 at 36.[4] The Offer Letter also describes Applegate's salary, benefits, and other conditions of employment. *Id.*; *see also Baker DC*, 378 F. Supp. 3d at 409 (noting that courts look to the "length of the written agreement" and the "extent of its detail" to determine if it is completely integrated). Thus, it is the fully integrated agreement.

In response, Applegate principally argues that Letter of Commitment must be read in conjunction with the Offer Letter because the commitment letter adds important detail to the

---

[4] The Letter also references Applegate's right to "voluntarily terminate [his] employment," noting that he would be required to repay Navarro for his relocation expenses if he quit within two years. *Id.*

8

terms of his employment. First, Applegate highlights that the Letter of Commitment clarifies that his employment will begin from "the date the Notice to Proceed (NTP) is issued for the 100-day Transition Period of the contract." ECF Nos. 51 at 3–4; 37-2 at 33. From this, Applegate infers that the Letter of Commitment necessarily establishes his "start date." ECF No. 51 at 3–4. For several reasons, the Court disagrees with Applegate.

Most obviously, neither document refers to the other, so nothing on the face of the documents suggest that they comprise one contract. *Compare Baker DC*, 378 F. Supp. 3d at 409 (declining to read two documents together where there "is no indication…that either party sought to sever a single agreement into two or more parts"), *with Ford v. Antwerpen Motorcars Ltd.*, 443 Md. 470, 482–83 (2011) (construing two documents as one agreement where the two documents incorporate each other by reference). Moreover, the plain language of the documents refutes Applegate's argument that the Letter of Commitment clarifies Applegate's start date. The Offer Letter identifies Applegate's "start date" with Navarro as being determined upon award of the 222-S contract; that is, it identifies when he will begin as Navarro's employee. ECF No. 37-2 at 36. But the Letter of Commitment, obtained for DOE, refers to when Applegate will begin to "perform" on the contract itself. *Id.* at 33. Although related, the concepts of Applegate's "start date" with Navarro and the date of "performance" with DOE are sufficiently distinct—for example, Applegate could begin his employment at Navarro before he actually begins performing on the DOE contract. Thus, the Court cannot read the Letter of Commitment as clarifying Applegate's start date set forth in the Offer Letter.

Navarro-Valenti's testimony supports this conclusion. Repeatedly, Navarro-Valenti confirmed that Navarro only hires employees on an at-will basis, as reflected in the Offer Letter. ECF Nos. 37-1 at 30–31; 42-1 at 13. Navarro further confirmed that the Letter of Commitment

9

is not an agreement between Navarro and a putative employee, but rather is secured for DOE "for the government to understand that this is a genuine, valid candidate" to perform on the contract. ECF No. 37-1 at 30. Indeed, Lesher made sure that Applegate knew as much when he described the Letter of Commitment as required "for the *proposal*." ECF No. 37-2 at 34 (emphasis added). On this record, the Court simply cannot construe the Letter of Commitment as part of the Offer Letter, as Applegate suggests.

A variation on this theme, Applegate also contends that the Letter of Commitment clarifies that Applegate would be expected to relocate to Washington state, and thus must be considered part of Navarro's employment offer. ECF No. 51 at 3–4. But the Offer Letter already made the relocation requirement plain. The Offer Letter promised that Navarro "will help with [Applegate's] relocation to Washington," and provided a housing allowance for Applegate while in "Richland, WA." ECF No. 37-2 at 36. Clearly from this, Applegate knew he would have to move to Washington as part of the new job. The Letter of Commitment adds nothing in that regard.

Applegate also argues that his having signed both documents together provides sufficient evidence that they constitute one agreement. ECF No. 51 at 4. Again, this fact, standing alone, does not eclipse the plain language of the documents. Although Applegate refers the Court to supposed authority that supports this proposition, no such case concludes that the mere contemporaneous signing of two documents compels a finding that the documents must be read as one agreement. *Cf. Jaguar Land Rover*, 738 F. Supp. 2d at 648–49 (reading three documents together with cross-referenced requirements); *Ford*, 443 Md. at 482–83 (documents each incorporated into the other by reference); *Shoreham Devs.*, 248 Md. at 269–72 (documents covering same transaction had been separated for tax purposes). Accordingly, the Court

concludes that the Offer Letter constitutes a completely integrated employment agreement.

Applegate does not dispute that the Offer Letter, standing alone, is an at-will employment agreement. Because an at-will employee cannot challenge his termination in a breach of contract action, *see Parks*, 421 Md. at 73, summary judgment on Applegate's breach of contract claim must be granted to Navarro.[5]

### B. Unjust Enrichment

Applegate next alleges that Navarro was justly enriched because it had obtained the 222-S contract by using his name and resume. ECF No. 4 ¶¶ 30–33. To survive summary judgment on an unjust enrichment claim in Maryland, a plaintiff must adduce some evidence that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted the benefit under circumstances that would make it inequitable for the defendant to retain the benefit without the payment of its value. *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151 (2000).

Navarro argues that the unjust enrichment claim must fail because Applegate, identified by DOE as a ▓▓▓▓▓▓ conferred no benefit upon Navarro. ECF No. 36 at 16. Although Applegate's response is difficult to pinpoint, he seems to argue that his mere inclusion in the proposal conferred a benefit because Navarro ultimately received the contract.

When viewing the record most favorably to Applegate, the Court must agree with Navarro. It is undisputed that Applegate ▓▓▓▓▓▓ from Navarro's DOE proposal. SEB described him as the ▓▓▓▓▓▓ on the proposal, whose ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ECF No. 38-2 at 3. SEB further identifies Applegate's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[5] The Court need not reach Navarro's alternative argument that even if the employment agreement had been for a term of years, Applegate failed to satisfy the pre-employment screening requirements. ECF No. 36 at 14–15.

*Id.*  Despite this, Navarro won the contract, but no rational factfinder could conclude that Applegate's inclusion in the proposal brought about this result.

Applegate does not dispute the veracity of SEB's findings.  Rather, he maintains that the claim should proceed because, despite his individual poor rating, SEB found the entire team to be "a very capable and qualified team of Key Personnel that would likely exceed 222-S Laboratory contract performance expectations." ECF No. 38-3.  SEB's view of the team's strength, however, does not allow the plausible inference that Applegate conferred a *benefit* on Navarro.  Rather, Navarro won the contract ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  With no evidence supporting that Applegate's inclusion in the DOE proposal conferred a benefit on Navarro, the claim necessarily fails.

Applegate next argues that his identification as optional "key personnel" in the ES&H position permitted the Navarro proposal to "stand out because of its commitment to safety." ECF No. 41 at 23.  Applegate offers no evidence to support his speculation.  *Othentec*, 526 F.3d at 140 (speculation does not defeat summary judgment).  Indeed, as the record makes clear, Navarro did not have to identify anyone in that position as part of the proposal.  Nor is there any evidence that inclusion at the outset gave Navarro a leg up on the award.  But more to the point, and as reflected in the SEB evaluation, including Applegate in fact ▮▮▮▮▮ from Navarro's overall bona fides.  Thus, construing the facts in the light most favorable to Applegate, no reasonable juror could find that Navarro benefitted from including Applegate in the bid for the DOE contract.  Navarro is entitled to summary judgment on the unjust enrichment claim.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment is granted. A separate Order follows.

8/29/2023
Date

/S/
Paula Xinis
United States District Judge